**Leonard F. NELSON, Plaintiff-Appellant,**

v.

**Thomas S. KLEPPE, the Secretary of the Interior of the United States, et al., Defendants-Appellees.**

No. 74–1842.

United States Court of Appeals, Ninth Circuit.

Jan. 14, 1976.

Eugene F. Wiles (argued), Delaney, Wiles, Moore, Hayes & Reitman, Anchorage, Alaska, for plaintiff-appellant.

Jacques B. Gelin (argued), Dept. of Justice, Washington, D. C., for defendants-appellees.

## OPINION

Before DUNIWAY, TRASK and SNEED, Circuit Judges.

DUNIWAY, Circuit Judge:

Nelson appeals from a summary judgment which upheld a decision of the Department of the Interior denying Nelson a homestead patent. The principal question raised is whether the district court erred in holding that the Department's finding that Nelson did not have a habitable house on his homestead at the time of filing final proof is supported by substantial evidence. We reverse.

## I. *History of the Homestead*

Nelson, a veteran, filed a notice of Homestead Location with the Bureau of Land Management on February 11, 1963. On April 9, 1963, the Bureau acknowledged the entry, indicating that the land was available for homesteading.

The saga of Nelson's efforts to comply with the requirement of the Homestead laws is a fascinating one, and should give pause to anyone who might think that modern machinery will take the hardships and uncertainties out of homesteading. Suffice it to say that Nelson had to overcome problems ranging from mountainous terrain, which made access and cultivation difficult, expensive and chancy, to uncooperative and hostile neighbors, to sabotage, to the severity of Alaska winters, to lack of finances, to vandalism and theft, to injunctions, to the need for permits, going through the Anchorage City Planning and Zoning Commission, the Soil Conservation Service, the City Water Utility, the Planning Commission again, the Soil Conservation Service again, the United States Geological Survey Water Division, the Water Utility again, and the Public Health Service. It is not now claimed that Nelson failed to meet any of the requirements for a patent except the habitable house requirement; so we turn first to the facts as to the house.

Having obtained access to the property, albeit with considerable difficulty, Nelson put up a tent on the property in which he lived. He purchased a substantial amount of building material and rented a large truck to transport it to the property. Because the weather had damaged his road, the materials had to be transferred in shifts, first to a four-wheel drive vehicle that Nelson purchased, and finally to either a snowmobile or dog-sled, before finally reaching the homestead site.

Nelson and two friends then constructed the dwelling house while living in the tent, this during the 1963–64 winter, when temperatures were "in the vicinity of 35 degrees below." The house was completed on February 7, 1964, with dimensions of 20 feet by 24 feet. On February 9, the house was insulated on the interior and equipped with a generator, electrical wiring, two space heaters, a kerosene burner, a butane reflector heater, a butane cooking range, a double bed and two bunk beds, a dining table and chairs, a refrigerator, a TV set, and a number of books. Nelson's wife and children moved into the house on that day, and the children enrolled in the local school. It was not until March 11, 1964, that electricity was connected to the house and it was thereafter heated by electric wall heaters. With the exception of three nights for himself and two weeks for his family, Nelson and the family slept every night on the homestead until September 15, 1964.

The house that Nelson owned in Anchorage was leased, and when vacated in mid-1964, it was put up for sale. Unable to sell the Anchorage house and beset with severe financial problems, as well as the problems of access to the homestead, Nelson and his family decided to move temporarily to the house in Anchorage in September of 1964. In March of 1965, however, that house was sold at a trust deed sale by the unpaid mortgagee. At the same time, Nelson's membership in the Alaska National Guard was threatened by his failure to become educationally qualified for promotion. Not wanting to lose this crucial source of income, Nelson left in April of 1965 for military schooling in Georgia which was to last until August of that year. Before leaving, Nelson made arrangements to have his homestead land cleared and cultivated by a Mr. Safve. Nelson also entrusted the portable heaters and electric meter to Mr. Safve to protect them from vandalism in his absence. After many difficulties were overcome, the land was cleared and seeded in September of 1966.

Nelson submitted his final proof to the Bureau of Land Management on November 25, 1966. The homestead was examined for compliance with law on August 2, 1967, by Mr. Thurston, BLM Area Manager, and Mr. Merrick, a local real estate specialist. They found the house to be in a run-down state with some of the insulation wet and hanging, some of the tarpaper on the roof blown away causing the roof to leak in spots, and the heating and electrical equipment missing. Based on this report, on January 3, 1968, the BLM filed a contest complaint alleging that Nelson had failed to comply with 43 U.S.C. § 164 in several particulars, including failure to have a habitable house on the property.

In September of 1969, a hearing was held on the contest and the Hearing Examiner held in favor of Nelson on all points. On December 6, 1972, the Interior Board of Land Appeals (IBLA) found that Nelson did not have a habitable house on the land at the time of final proof and, solely on that ground, it reversed the Hearing Examiner. Nelson then filed this action in the district court, which affirmed denial of the patent on the ground that the finding of the IBLA was supported by substantial evidence.

## II. *Is Habitability Required?*

Nelson claims that 43 U.S.C. § 164 does not require that a habitable house exist on the homestead at the time of final proof. Rather, he argues that habitability is but one important factor to be considered in determining the ultimate issue of the homesteader's good faith effort and intention to settle and cultivate. We do not agree.

The relevant portion of 43 U.S.C. § 164 reads:

No certificate shall be given or patent issued therefor until . . . the person making such entry . . . proves by himself and two credible witnesses that he, she, or they *have a habitable house upon the land* and have actually resided upon and culti-

vated the same for the term of three years succeeding the time of filing the affidavit. . . . (emphasis added). Nelson's argument that a number of cases decided by the Interior Department have held habitability not to be a requirement for issuance of a patent fails to recognize that the cases to which he refers were decided before the 1912 amendment which added the crucial language to the statute. Since 1912, the Interior Department has consistently taken the position that habitability is required at the time of final proof. *See* "Suggestions to Homesteaders and Persons Desiring to Make Homestead Entries," 1913, 42 L.D. 35, 44; "Acquisition of Title to Public Lands," 1916, 45 L.D. 227, 233; *United States v. Cooke*, 1947, 59 I.D. 489, 505; *United States v. Wells*, 1971, 78 I.D. 163, 164; 43 C.F.R. § 2511.-4–1. In *Blanche Westbrook*, 1915, 43 L.D. 559, 561, the Department argued that the 1912 language was adopted in order to reduce the residency requirement by two years and to allow five months absence each year, but on the other hand required the construction of a habitable house and actual, rather than constructive, residence.

■ We agree with the Department's interpretation. The statute is clear on its face in requiring a habitable house at the time of final proof, and there is no evidence to suggest that Congress intended any other interpretation. As the District of Columbia Circuit noted in *Wilbur v. United States*, 1931, 60 U.S. App.D.C. 299, 53 F.2d 717, 719:

The requirement [in § 164] with respect to the evidence of an existing habitable house upon a homestead, at the time of final proof, is a legal requirement, a condition precedent to the right of the entryman to title, and not a matter which the officials of the Land Office can waive or disregard.

### III. *Was Nelson's House Habitable?*

The IBLA's basis for finding that Nelson's house was not habitable at the time of final proof was that:

It was in a deteriorated condition. The tarpaper on the roof had come off and the insulation from the ceiling rafters was wet and hanging. The electrical connections to the cabin, by then, had been removed and there were no apparent facilities for heating. (citations omitted). Taken from The Report of the Hearing Examiner.

The IBLA concluded that because of these facts, "the house on the entry cannot be considered to be a 'habitable' " house under the law. We do not agree.

■ The house was certainly habitable from February 9 through September 15, 1964. During all that time, Nelson and his wife and children inhabited it. Their doing so fulfilled the requirement of three years' actual residence because, first, 43 U.S.C. § 164 permits seven months' residence during a year to satisfy that year's residence requirement and, because, second, 43 U.S.C. § 279 permits Nelson, as a Korean war veteran, to live on the property for but one year (actually seven months) instead of three years. Thus the law, in the case of a veteran like Nelson, permits what happened here—seven months' actual residency followed by more than two years absence, the house standing vacant. Some dilapidation and some vandalism, in the mountains of Alaska and in Alaska weather but near a city, are to be expected—indeed, inevitable. Nelson is not required to reside in the home at the time of final proof; he is only required to have a habitable house on the land. The veteran's privileges given by the law require that "habitability" at time of proof be construed liberally in favor of the veteran.[1] Otherwise, he may find that by doing exactly what the law per-

1. This is in accord with long standing policy in favor of all homesteaders. "The policy of the Federal government in favor of settlers upon the public lands has been liberal" *Clements v. Warner*, 1861, 24 How. (65 U.S.) 394, 397, 16 L.Ed. 695; "[t]he law deals tenderly with one who, in good faith, goes upon the public lands, with a view of making a home thereon." *Ard v. Brandon*, 1895, 156 U.S. 537, 543, 15 S.Ct. 406, 409, 39 L.Ed. 524.

mitted him to do, he has lost his homestead. We confine our decision to the case of the veteran.

 Like the IBLA, we accept the Hearing Examiner's factual findings as to the condition of the house when Nelson filed his final proof. But we do not accept the IBLA's conclusion that the house was not habitable.[2] The historical records and journals of America's westward expansion are replete with accounts of homesteads, from Montana and the Dakotas to Oklahoma, which would make Nelson's house, even in its dilapidated condition, appear palatial. Windowless sod huts dependent upon burning buffalo chips for light and heat housed much of America's homesteading population on the great plains long before "electricity" was part of a layman's vocabulary. While the settlement of the Alaskan frontier is occurring in a day when many of the homes of America, including homes of Anchorage, are equipped with the ultimate in comfort and convenience, we find no reason to ignore the precedent established by the early homesteaders to whom patents were freely granted by a government grateful for their efforts in extending the frontier.

 The IBLA in part rested its decision on the "obvious rigors" of an Alaskan winter. Disregarding the fact that the law permits homesteaders to be absent from their homesteads for five months of the year, we take judicial notice of the fact that the rigors of a North Dakota winter may be no less severe than those of Anchorage, Alaska. The deterioration that Nelson's house had suffered could easily and quickly have been remedied in a matter of hours or, at most, a day or two. New tarpaper could have been tacked on the roof, the insulation could have been restapled to the rafters, and heating and electrical equipment could have been retrieved from Mr. Safve, or brought from elsewhere with a minimum of time and effort.

Considering the history of American homesteading, the ease with which repairs could have been effected by Nelson, the natural deterioration permitted by § 279, and the policy of construing the statutes favorably to veteran homesteaders, we find that Nelson's house was habitable at the time of final proof, and that the IBLA's finding to the contrary is not supported by substantial evidence.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

---

2. We see no reason to give to the word "habitable" any meaning other than its ordinary or "dictionary" meaning. Habitable: "Fit to be inhabited or dwelt in; suitable for human abode." (Funk & Wagnall's New Standard Dictionary). "Capable of being inhabited; that may be inhabited or dwelt in; . . . specif., of a dwelling, reasonably fit for occupation by a tenant of the class . . . ordinarily occupying such a dwelling." (Webster's New International Dictionary, 2d Ed.)